**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARIZONA DREAM ACT COALITION;
JESUS CASTRO-MARTINEZ;
CHRISTIAN JACOBO; ALEJANDRA
LOPEZ; ARIEL MARTINEZ; NATALIA
PEREZ-GALLEGOS,
          *Plaintiffs-Appellants*,

v.

JANICE K. BREWER, Governor of the
State of Arizona, in her official
capacity; JOHN S. HALIKOWSKI,
Director of the Arizona Department
of Transportation, in his official
capacity; STACEY K. STANTON,
Assistant Director of the Motor
Vehicle Division of the Arizona
Department of Transportation, in her
official capacity,
          *Defendants-Appellees*.

No. 13-16248

D.C. No.
2:12-cv-02546-
DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
December 3, 2013—Pasadena, California

Filed July 7, 2014

Before:  Harry Pregerson, Marsha S. Berzon,
and Morgan Christen, Circuit Judges.

Opinion by Judge Pregerson;
Concurrence by Judge Christen

## SUMMARY[*]

### Civil Rights

The panel reversed the district court's denial of a motion for a preliminary injunction and remanded in an action challenging an Arizona policy which prohibits recipients of the federal program called the "Deferred Action for Childhood Arrivals" from obtaining driver's licenses by using Employment Authorization Documents as proof of their authorized presence in the United States.

The Deferred Action for Childhood Arrivals (DACA) program authorizes certain immigrants, who came without permission to the United States as children, to remain in the United States.  The panel stated that although on the current record, it was unable to resolve whether plaintiffs had established a likelihood of success on the merits of their preemption claim, plaintiffs had shown that they were likely to succeed on the merits of their equal protection claim. The panel held that even applying a rational basis of review, it

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

could identify no legitimate state interest that was rationally related to defendants' decision to treat DACA recipients disparately from other noncitizens who were permitted to use their Employment Authorization Documents as proof of their authorized presence in the United States when applying for driver's licenses.

The panel further held that plaintiffs had shown that they were likely to suffer irreparable harm unless defendants' policy was enjoined, and that both the balance of equities and the public interest favored an injunction. The panel remanded with instructions that the district court enter a preliminary injunction prohibiting defendants from enforcing any policy by which the Arizona Department of Transportation refuses to accept plaintiffs' Employment Authorization Documents, issued to plaintiffs under DACA, as proof that plaintiffs are authorized under federal law to be present in the United States.

Joining in the majority opinion and concurring as to Part II.A, Judge Christen stated that she agreed that plaintiffs demonstrated a likelihood of success on the merits of their equal protection claim. Judge Christen further agreed that plaintiffs had shown a likelihood of irreparable injury, and satisfied the other prerequisites for injunctive relief. She wrote separately to express her view that plaintiffs had also demonstrated a likelihood of success on their preemption claim because Arizona's policy regulates immigration by creating a new classification of alien status.

**COUNSEL**

Victor Viramontes (argued) and Jorge M. Castillo, Mexican American Legal Defense and Educational Fund, Los Angeles, California; Jennifer Chang Newell, Cecillia D. Wang, Araceli Martínez, Michael Tan, and R. Orion Danjuma, American Civil Liberties Union Foundation Immigrants' Rights Project, San Francisco, California; Linton Joaquin, Karen C. Tumlin, Shiu-Ming Cheer, Nora A. Preciado, and Nicholás Espíritu, National Immigration Law Center, Los Angeles, California; Daniel J. Pochoda, Kelly J. Flood, and James Duff Lyall, ACLU Foundation of Arizona, Phoenix, Arizona, for Plaintiffs-Appellants.

Timothy Berg (argued), Douglas C. Northup, and Sean T. Hood, Fennemore Craig, P.C., Phoenix, Arizona; Joseph Sciarrotta, Jr., Office of Governor Janice K. Brewer, Phoenix, Arizona, for Defendants-Appellees.

Lawrence J. Joseph, Washington, D.C., for Amicus Curiae Eagle Forum Education & Legal Defense Fund.

**OPINION**

PREGERSON, Circuit Judge:

The federal government has enacted a program called "Deferred Action for Childhood Arrivals" ("DACA"), which authorizes certain immigrants who came to the United States as children, without permission, to remain in the United States. In response, Arizona officials — Defendants here — implemented a policy that prevents DACA recipients from obtaining Arizona driver's licenses.

Plaintiffs — five individual DACA recipients living in Arizona, plus an organization promoting the interests of young immigrants — sought a preliminary injunction prohibiting Defendants from enforcing their policy, arguing that the policy violates the Equal Protection Clause and is preempted. The district court found that Defendants' policy deprives Plaintiffs of driver's licenses for no rational reason, and thus violates the Equal Protection Clause. The district court nonetheless denied the preliminary injunction, because it found Plaintiffs were not likely to suffer irreparable harm from this constitutional violation.

We agree that Plaintiffs have demonstrated a likelihood of success on the merits of their equal protection claim. And contrary to the district court's conclusion, we hold that Plaintiffs are likely to suffer irreparable harm unless Defendants' policy is enjoined. The remaining injunction factors — the public interest and the balance of the equities — also tip in Plaintiffs' favor. We therefore reverse the district court's denial of a preliminary injunction. We remand for entry of a preliminary injunction prohibiting Defendants from enforcing its policy by which the Arizona Department of Transportation refuses to accept Plaintiffs' Employment Authorization Documents, issued to Plaintiffs under DACA, for purposes of obtaining an Arizona driver's license.

## BACKGROUND

### *Deferred Action for Childhood Arrivals*

Many immigrants come to the United States as children, without permission, and subsequently remain in this country as they mature into adults. The Secretary of Homeland

Security has determined that our nation's immigration laws were not designed "to remove productive young people to countries where they may not have lived or even speak the language" — particularly when "many of these young people have already contributed to our country in significant ways." Memorandum from Janet Napolitano, Sec'y of Homeland Sec., on Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012). On June 15, 2012, the Secretary announced that her Department would begin exercising prosecutorial discretion in immigration cases involving these young people. Specifically, the Department of Homeland Security (DHS) would offer "certain young people who were brought to this country as children and know only this country as home" a form of deferred action, which would allow them to remain present in the United States without fear of removal. This policy came to be known as "Deferred Action for Childhood Arrivals," or "DACA."

To be eligible for DACA, immigrants must have come to the United States before the age of sixteen and have been under thirty-one years old as of June 15, 2012; they must have been living in the United States when DACA was announced and have continuously resided in the United States for at least the previous five years; and they must have graduated from high school, or obtained a GED, or have been honorably discharged from the United States Armed Forces or the Coast Guard, or be currently enrolled in school. Additionally, they must not pose any threat to public safety: anyone who has been convicted of multiple misdemeanors, a single significant misdemeanor, or any felony offense is ineligible for DACA.

Like recipients of other forms of deferred action, DACA recipients enjoy no formal immigration status. Nevertheless, DACA recipients are permitted by DHS to remain in the United States for a renewable two-year period. DHS considers DACA recipients not to be unlawfully present in the United States because their deferred action is a period of stay authorized by the Attorney General. *See* 8 U.S.C. § 1182(a)(9)(B)(ii); 8 C.F.R. 214.14(d)(3); U.S. Immigration and Naturalization Servs., Adjudicator's Field Manual Ch. 40.9.2(b)(3)(J). DACA recipients are also eligible to receive Employment Authorization Documents, allowing them to work in the United States. Indeed, would-be DACA recipients are *required* to apply for employment authorization when they apply for DACA.

### *Arizona Law and Defendants' Policy*

Arizona law prohibits the Arizona Department of Transportation from issuing driver's licenses to anyone "who does not submit proof satisfactory to the department that the applicant's presence in the United States is authorized under federal law." Ariz. Rev. Stat. Ann. § 28-3153(D). Arizona does not further define "presence . . . authorized under federal law," except through an Arizona Department of Transportation policy listing the documents it accepts as establishing authorized presence. Ariz. Dep't of Transp. Policy 16.1.2. Until August 2012, that policy listed all Employment Authorization Documents issued by the federal government as sufficient to establish "that the applicant's presence in the United States is authorized under federal law" within the meaning of this Arizona statute.

On August 15, 2012 — the same day the federal government's DACA policy took effect — Arizona Governor

Janice Brewer issued an executive order. Executive Order 2012-06, "Re-Affirming Intent of Arizona Law In Response to the Federal Government's Deferred Action Program," (Aug. 15, 2012). The executive order warned that, under DACA, the federal government "plan[ned] to issue employment authorization documents to certain unlawfully present aliens . . . ." The order directed state agencies to prevent DACA recipients from becoming eligible for any "state identification, including a driver's license." Governor Brewer later explained that her executive order was designed to ensure that there would be "no driver licenses for illegal people." In Governor Brewer's words, DACA recipients "are here illegally and unlawfully in the state of Arizona . . . . The Obama amnesty plan doesn't make them legally here."

Pursuant to Governor Brewer's executive order, the Arizona Department of Transportation's Motor Vehicle Division revised its relevant policy to ensure that DACA recipients would not become eligible for Arizona driver's licenses. Specifically, the Motor Vehicle Division announced that it would not accept Employment Authorization Documents issued to DACA recipients — identified by the category code (c)(33) — as proof "that the applicant's presence in the United States is authorized under federal law," pursuant to Ariz. Rev. Stat. Ann. § 28-3153(D). At the time, the Motor Vehicle Division continued to accept all other federally issued Employment Authorization Documents as proof of lawful presence.

### *The Present Case*

Plaintiffs are five individual DACA recipients (all of whom reside in Arizona) and the Arizona DREAM Act Coalition, an organization that seeks to promote the interests

of young immigrants.  All five individual Plaintiffs possess Employment Authorization Documents issued under DACA. Thus, all five individual Plaintiffs are prevented from obtaining Arizona driver's licenses under Defendants' policy.

Together, Defendants are responsible for implementing and enforcing the policy by which Plaintiffs are unable to obtain Arizona driver's licenses.  Plaintiffs sued Defendants in the U.S. District Court for the District of Arizona. Plaintiffs alleged that Defendants' policy violates the Equal Protection Clause and the Supremacy Clause of the U.S. Constitution, and sought (*inter alia*) a preliminary injunction prohibiting defendants from enforcing their policy.

The district court denied Plaintiffs' motion for a preliminary injunction.  The district court agreed that Plaintiffs had established a likelihood of success on their equal protection claim, but it concluded that Plaintiffs had not shown a likelihood of irreparable harm.  The district court also concluded that Plaintiffs had not shown a likelihood of success on their preemption claim, and that neither the public interest nor the balance of the equities strongly favored either side.  Plaintiffs appealed.

### *Revision of Defendants' Policy*

While Plaintiffs' appeal was pending, Defendants revised their policy.  Under Defendants' revised policy, the Motor Vehicle Division still refuses to accept Employment Authorization Documents with category code (c)(33) — i.e., Employment Authorization Documents issued under DACA — as proof of authorized presence.  Now, however, the Motor Vehicle Division also refuses to accept Employment Authorization Documents with category codes (c)(14) (issued

to recipients of other forms of deferred action, *see* 8 C.F.R. § 274a.12(c)(14)) and (a)(11) (issued to recipients of deferred enforced departure, *see* 8 C.F.R. § 274a.12(a)(11)). Defendants contend that, as revised, their policy does not violate the Equal Protection Clause.

## JURISDICTION

We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STANDARD OF REVIEW

We review the district court's denial of a preliminary injunction for abuse of discretion. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). "A court abuses its discretion when it applies an incorrect legal rule or relies upon a factual finding that is illogical, implausible, or without support in inference that may be drawn from the record." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1014 (9th Cir. 2013) (internal quotation marks and alterations omitted).

## DISCUSSION

"A plaintiff seeking a preliminary injunction must establish that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs here have made all four of these showings.

Before we discuss the *Winter* factors, however, we must decide whether Plaintiffs' requested injunction is mandatory or prohibitory.

## I. Type of Injunction Sought

Defendants argue that Plaintiffs' requested injunction is mandatory, and thus subject to a heightened burden of proof. Defendants are mistaken.

"A mandatory injunction orders a responsible party to take action," while "[a] prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 878–79 (9th Cir. 2009) (internal quotation marks and alteration omitted). The relevant status quo is that "between the parties pending a resolution of a case on the merits." *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012). As this language from *McCormack* suggests, the "status quo" refers to the legally relevant relationship *between the parties* before the controversy arose. *See id*. at 1020.

Here, Plaintiffs contest the enforceability of Defendants' new policy. The status quo before Defendants' revised their policy in response to DACA was that Plaintiffs were subject to a legal regime under which all holders of federal Employment Authorization Documents were eligible for Arizona driver's licenses. By revising their policy in response to DACA, Defendants affirmatively changed this status quo.

The district court erred in defining the status quo *ante litem* as a situation in which "Defendants did not issue driver's licenses to Plaintiffs." Plaintiffs do not challenge any particular refusal to grant driver's licenses to them as individuals. Instead, Plaintiffs challenge the Arizona Department of Transportation's driver's license eligibility standards, in general. The result of an injunction here may be that, *under state law*, Arizona will ultimately provide driver's licenses to DACA recipients. But an injunction will not "order[]" Defendants to take this step. *See Marlyn Nutraceuticals*, 571 F.3d at 879.

Likewise, it does not matter that DACA recipients only became eligible for Employment Authorization Documents pursuant to a new federal policy, or that Defendants timed their new policy to come into effect before Plaintiffs could obtain Employment Authorization Documents. An action by a third party (here, the federal government) that will not be affected by this litigation cannot define the status quo *between the parties*.

Plaintiffs' requested preliminary injunction is not mandatory. Instead, like other injunctions that prohibit enforcement of a new law or policy, Plaintiffs' requested injunction is prohibitory. *See, e.g.*, *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 727–30, 732 n.13 (9th Cir. 1999).

## II.  Likelihood of Success on the Merits

### A.  Preemption Claim

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v.*

*Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing, *inter alia*, U.S. Const., art. VI, cl. 2; *Gibbons v. Ogden*, 9 Wheat. 1 (1824)).  Under this principle, "state law is naturally preempted to the extent of any conflict with a federal statute." *Id*.  State law is conflict-preempted when it is impossible to comply with both state law and federal law. *See, e.g.*, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963).  Additionally, even if it is possible to comply with both state and federal law, state law is conflict-preempted whenever it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Plaintiffs argue that Defendants' policy is conflict-preempted because it interferes with Congress's intent that the Executive Branch possess discretion to determine when noncitizens may work in the United States.  While we are unable to resolve this issue conclusively on the record now before us, we agree that Plaintiffs' conflict-preemption theory is plausible.

Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States.[1]  *See, e.g.*, 8 U.S.C. § 1324a(h)(3) (defining "unauthorized alien," for employment purposes, as an alien who is neither a lawful permanent resident nor "authorized to be . . . employed by this chapter or by the Attorney General"); 8 U.S.C. § 1324a(h)(1) (providing that Attorney General is

---

[1] Conversely, determining when noncitizens may work is not within the states' traditional police power. *See Truax v. Raich*, 239 U.S. 33, 42 (1915).

responsible for certifying aliens' right to work in the United States); 8 U.S.C. § 1324a(b)(1)(C)(ii) (providing that a document is valid as evidence of employment authorization if "the Attorney General finds [it], by regulation, to be acceptable" for that purpose); *see also* 8 U.S.C. § 1103(g)(2) (authorizing Attorney General to "perform such other acts as the Attorney General determines to be necessary" to enforce the nation's immigration laws); 8 C.F.R. § 274a.12 (establishing classes of noncitizens authorized to work in the United States).   Exercising this discretion, the Executive Branch has determined that deferred action recipients — including DACA recipients — are ordinarily authorized to work in the United States.  8 C.F.R. § 274a.12(c)(14).  In fact, DACA recipients are *required* to apply for employment authorization, in keeping with the Executive's intention that DACA recipients remain "productive" members of society.

Plaintiffs' conflict preemption argument is that although Congress has given the Executive discretion to determine when noncitizens may work in the United States, and the Executive has determined that DACA recipients may — indeed, *should* — work in the United States, Defendants' policy obstructs many DACA recipients' ability to work in Arizona.  By ensuring that DACA recipients are unable to drive, Plaintiffs maintain, Defendants' policy severely curtails DACA recipients' ability to work.

As a practical matter, the ability to drive may be a virtual necessity for people who want to work in Arizona.  The record shows that more than eighty-seven percent of Arizona's workforce commutes to work by car. (By contrast, only about two percent of Arizonans commute to work using public transportation.)   Indeed, with one exception, the individual Plaintiffs in this case — like the vast majority of

working Arizonans — rely on cars in commuting to work.[2] And beyond the need for transportation, the link between driver's licenses and the ability to work is heightened by the fact that some jobs — including jobs for which two Plaintiffs wished to apply — require driver's licenses as a condition of hire. If Plaintiffs can ultimately show adequate proof of the link between driver's licenses and the ability to work in Arizona, we agree that Defendants' policy would be conflict-preempted.

It does not matter that Defendants' policy does not formally prohibit DACA recipients from working. "[P]reemption analysis must contemplate the practical result of the state law, not just the means that a state utilizes to accomplish the goal." *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 2022 (2013). In considering whether a state law is conflict-preempted, "we 'consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written.'" *Ting v. AT&T*, 319 F.3d 1126, 1137 (9th Cir. 2003) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977)). If the practical result of the application of Defendants' policy is that DACA recipients in Arizona are generally obstructed from working — despite the Executive's determination, backed by a delegation of Congressional authority, that DACA recipients throughout the United States may work — then Defendants' policy is preempted.

---

[2] One Plaintiff does not commute to work by car only because she does not work at all: her lack of a driver's license prevents her from pursuing employment. Another Plaintiff is compelled to spend four hours each day commuting via public transportation because he is unable to obtain a driver's license. Previously, this same Plaintiff relied on a third party to drive him to and from work each day. The remaining three individual Plaintiffs all commute to work by car.

Likewise, it does not matter that DACA recipients in Arizona may drive to work illegally, without possessing valid Arizona driver's licenses. "[P]re-emption cases ordinarily assume compliance with the state-law duty in question." *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 882 (2000) (emphasis omitted). State law is preempted whenever its application would frustrate the objectives and purposes of Congress, even if the state law's own application is frustrated by individuals' noncompliance.

If, on the merits, Plaintiffs submit adequate proof that Defendants' policy interferes with the DHS Secretary's directive that DACA recipients be permitted (and, indeed, encouraged) to work, they will, in turn, show that Defendants' policy interferes with Congress's intention that the Executive determine when noncitizens may work in the United States. In this way, Defendants' policy would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 132 S. Ct. at 2501.

We need not rely on Plaintiffs' preemption claim, however, in determining whether Plaintiffs have established a likelihood of success on the merits of their challenge to Defendants' policy. As we next explain — and as the district court held — Plaintiffs have established a likelihood of success on the merits of their Equal Protection Clause claim.[3]

---

[3] We need not, and do not, reach Plaintiffs' other preemption arguments at this preliminary stage in the litigation. The fact that we do not reach Plaintiffs' other preemption arguments, however, does not mean that Judges Pregerson and Berzon disagree with Judge Christen's thoughtful and persuasive concurrence. On the contrary, for the reasons Judge Christen notes, *see* Concurring Opinion at 35 n.7, Plaintiffs may well succeed on their argument that Defendants' policy is conflict-preempted

As we also conclude that the other requisites for injunctive relief are met, we must reverse the district court's denial of a preliminary injunction whether or not the record on Plaintiffs' work authorization conflict preemption theory is now adequate to establish a likelihood of success on that theory.

## B.  Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  Plaintiffs may prevail on their equal protection claim by showing "that a class that is similarly situated has been treated disparately." *Christian Gospel Church, Inc. v. City and Cnty. of San Francisco*, 896 F.2d 1221, 1225 (9th Cir. 1990).

"The first step in equal protection analysis is to identify the state's classification of groups." *Country Classic Dairies, Inc. v. Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988).  "The groups must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005).  The groups

---

in that it conflicts with the federal understanding that DACA recipients enjoy "authorized" presence in the United States.  Additionally, Judges Pregerson and Berzon might well agree with Judge Christen's insightful field preemption analysis, if Judges Pregerson and Berzon were convinced that Plaintiffs had raised this variety of preemption argument as a ground for preliminary relief.

need not be similar in all respects, but they must be similar in those respects relevant to the Defendants' policy. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

We agree with the district court that DACA recipients are similarly situated to other categories of noncitizens who may use Employment Authorization Documents to obtain driver's licenses in Arizona. Even under Defendants' revised policy, Arizona issues driver's licenses to noncitizens holding Employment Authorization Documents with category codes (c)(9) and (c)(10). These (c)(9) and (c)(10) Employment Authorization Documents are issued to noncitizens who have applied for adjustment of status and cancellation of removal, respectively. *See* 8 C.F.R. § 274a.12(c)(9)–(10). As the district court held, these noncitizens are likely similarly situated to DACA recipients.

Defendants look to the statutory and regulatory availability of immigration relief for the (c)(9) and (c)(10) groups as a point of distinction. But individuals with (c)(10) employment authorization, for example, are not in the United States pursuant to any statutory provision while their applications are pending. With regard to adjustment of status, we have noted that "the submission of an application does not connote that the alien's immigration status has changed, as the very real possibility exists that the INS will deny the alien's application altogether." *Vasquez de Alcantar v. Holder*, 645 F.3d 1097, 1103 (9th Cir. 2011) (quoting *United States v. Elrawy*, 448 F.3d 309, 313 (5th Cir. 2006)).

In sum, like DACA recipients, many noncitizens who have applied for adjustment of status and cancellation of removal possess no formal lawful immigration status, and may never obtain any. *See Guevara v. Holder*, 649 F.3d

1086, 1095 (9th Cir. 2011).   Like DACA recipients, noncitizens who have applied for adjustment of status and cancellation of removal often have little hope of obtaining formal immigration status in the foreseeable future.  Indeed, those with (c)(10) documents are already in removal proceedings, while many DACA recipients are not — suggesting that individuals in the (c)(10) category are more, not less, likely to be removed in the near future than are DACA recipients.  In the relevant respects, then, noncitizens with (c)(9) and (c)(10) employment authorization documents are similarly situated to DACA recipients.

Unlike DACA recipients, however, noncitizens holding (c)(9) and (c)(10) Employment Authorization Documents may use those documents when applying for Arizona driver's licenses to prove — to the satisfaction of the Arizona Department of Transportation — that their presence in the United States is authorized under federal law.  As the district court found, these two groups of noncitizens account for more than sixty-six percent of applicants who obtained Arizona driver's licenses using Employment Authorization Documents during the past seven years.  Although DACA recipients are similarly situated to noncitizens holding (c)(9) and (c)(10) Employment Authorization Documents, they have been treated disparately.

Having concluded that Defendants' revised policy targets DACA recipients for disparate treatment, as compared to other persons who are similarly situated, we would ordinarily determine which standard of scrutiny to apply to Defendants' policy.  *See, e.g.*, *Country Classic Dairies*, 847 F.2d at 596. Here, however, we need not decide what standard of scrutiny applies to Defendants' policy:  as the district court concluded,

Defendants' policy is likely to fail even rational basis review.[4]

To survive rational basis review, Defendants' disparate treatment of DACA recipients must be "rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440. Even considering the revisions to Defendants' policy, we can identify no legitimate state interest that is rationally related to Defendants' decision to treat DACA recipients disparately from noncitizens holding (c)(9) and (c)(10) Employment Authorization Documents. Defendants suggest that it is rational to accept (c)(9) and (c)(10) Employment Authorization Documents as proof that the holder's "presence . . . is authorized under federal law," Ariz. Rev. Stat. Ann. § 28-3153(D), because persons with (c)(9) and (c)(10) documents "[are] on a path to lawful status," while DACA recipients are not. As an initial matter, we are unconvinced that Defendants have defined "a path to lawful status" in a meaningful way. After all, noncitizens' applications for adjustment of status or cancellation of removal are often denied, so the supposed "path" may lead to a dead end. But even if we were to accept the premise of Defendants' argument, we would still reject the conclusion. Defendants' policy must be rationally related to a legitimate state interest in treating noncitizens holding (c)(9) and (c)(10) Employment

---

[4] Though we need not decide what standard of scrutiny to apply here, we note that the Supreme Court has consistently required the application of strict scrutiny to state action that discriminates against noncitizens authorized to be present in the United States. *See Nyquist v. Mauclet*, 432 U.S. 1 (1977); *Graham v. Richardson*, 403 U.S. 365 (1971); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948). Conversely, alienage-based discrimination is subject to rational basis review only when the aliens targeted by that discrimination are "presen[t] in this country in violation of federal law." *Plyler v. Doe*, 457 U.S. 202, 223 (1982).

Authorization Documents as authorized to be present in the United States under federal law, while refusing to so treat Plaintiffs.

We discern no rational relationship between Defendants' policy and a legitimate state interest. Instead, in purporting to distinguish between these categories, Arizona assumes for itself the federal prerogative of classifying noncitizens — despite the fact that "[t]he States enjoy no power with respect to the classification of aliens." *Plyler*, 457 U.S. at 225.

Unless there is some basis in *federal* law for viewing (c)(9) and (c)(10) Employment Authorization recipients as having federally authorized presence that DACA recipients lack, Arizona's attempt at rationalizing this discrimination fails. *See id*. We can see no such basis: we see no reason why Employment Authorization Documents held by (c)(9) and (c)(10) noncitizens demonstrate federally authorized presence, while DACA recipients' Employment Authorization Documents do not. Defendants assert that "unlike deferred action recipients, [Employment Authorization Document] holders with all other codes either have lawful status, are on a path to lawful status, or have an [Employment Authorization Document] that is tied to relief provided for under the [Immigration and Nationality Act]." But Employment Authorization Documents merely "tied" to the *potential* for relief do not indicate that the document holder has *current* federally authorized presence, as Arizona law expressly requires. Ariz. Rev. Stat. Ann. § 28-3153(D).

Nor is it apparent why, if Employment Authorization Documents held by (c)(9) and (c)(10) noncitizens *do* establish that their bearers are currently authorized to be present in the United States, the same is not true of Plaintiffs' Employment

Authorization Documents.    Until (c)(9) and (c)(10) noncitizens receive the relief that they have applied for, they are authorized to be present in the United States in the same sense that DACA recipients are authorized to be here: in both cases, the federal government has allowed noncitizens to remain in the United States, has pledged not to remove them during the designated period, and has authorized them to work in this country.  Defendants' "enjoy no power with respect to the classification of aliens," *Plyler*, 457 U.S. at 225, so their attempt to distinguish between these noncitizens on the basis of an immigration classification that has no basis in federal law is not likely to withstand equal protection scrutiny.

Defendants advance four other justifications for their policy, all of which were also raised in — and rejected by — the district court.  These additional justifications purport to rely on Defendants' judgment as to the wisdom of granting driver's licenses to DACA recipients, to explain Defendants' differential treatment of otherwise equivalent federal immigration classifications.

We agree with the district court that Defendants' other justifications for their policy are unlikely to survive rational basis review.  The granting or withholding of driver's licenses is tangential to the classification before us.  Defendants' "rel[iance] on a classification" — the classification of DACA recipients as federally unauthorized and noncitizens with (c)(9) and (c)(10) Employment Authorization Documents as federally authorized —  "whose relationship to an asserted goal"  —  limiting access to driver's licenses  — "is so attenuated as to render the distinction arbitrary or irrational," is not likely to withstand rational basis review.  *City of Cleburne*, 473 U.S. at 446.

First, Defendants suggest that issuing driver's licenses to DACA recipients might expose the Arizona Department of Transportation to legal liability "for issuing driver's licenses to 80,000 unauthorized immigrants." As the district court noted, however, "this concern has not been borne out by the numbers": as of February 14, 2013, only 14,938 Arizona residents had applied for DACA. (Meanwhile, between 2005 and 2012, Arizona issued approximately 47,500 driver's licenses to holders of non-DACA Employment Authorization Documents.) Also, as the district court noted, Defendants are unable to identify instances in which the Arizona Department of Transportation has faced liability for issuing licenses to noncitizens not authorized to be present in the United States.

Second, Defendants suggest that issuing driver's licenses to DACA recipients might allow DACA recipients to access state and federal benefits to which they are not entitled. As the district court observed, however, Defendant Halikowski (Director of the Arizona Department of Transportation) and Defendant Stanton (Assistant Director for the Motor Vehicle Division) testified that they had *no* basis whatsoever for believing that a driver's license alone could be used to establish eligibility for such benefits. It follows that Defendants have no *rational* basis for any such belief.

Third, Defendants suggest that the DACA program might be canceled, requiring Arizona to revoke DACA recipients' driver's licenses.[5] If anything, however, it is *less* likely that

---

[5] In the same vein, Defendants argue for the first time on appeal that their policy avoids "unduly burdening [the Arizona Department of Transportation] with processing an extremely large number of license applications from groups that are not lawfully authorized to be in the United States . . . ." As noted, the numbers do not bear out this fear,

Arizona will need to revoke DACA recipients' driver's licenses, compared to driver's licenses issued to noncitizens holding (c)(9) and (c)(10) Employment Authorization Documents.   While Defendants' concern for DACA's longevity is purely speculative, applications for adjustment of status or cancellation of removal are routinely denied.

Fourth, Defendants suggest that DACA recipients may have their authorized presence revoked at any time, and thereafter may be quickly removed from the United States, leaving those they may have injured in automobile accidents with no financial recourse.  Here too, however, Defendants' professed concern applies with equal force to noncitizens holding (c)(9) and (c)(10) Employment Authorization Documents.  Noncitizens who have applied for adjustment of status or cancellation of removal may find their applications denied at any time, and thereafter may be quickly removed from the United States, leaving those they may have injured in automobile accidents with no financial recourse. Nevertheless, Defendants' policy allows noncitizens holding (c)(9) and (c)(10) Employment Authorization Documents to obtain driver's licenses, while prohibiting DACA recipients from doing the same.[6]

---

especially when compared to the non-DACA holders of Employment Authorization Documents who have received licenses.

[6] Indeed, Defendants' professed concern applies to practically every driver that Arizona now licenses.  *Any* driver — regardless of his or her citizenship or immigration status — could flee Arizona after an automobile accident, in an effort to avoid financial responsibility for that accident.

To mitigate this risk, Arizona already requires every driver to carry proof of financial responsibility, such as car insurance.  *See* Ariz. Rev.

The record does suggest one additional reason for Defendants' policy, but that reason does not establish that Defendants' classification of DACA recipients is rationally related to a legitimate state interest.  Defendants' policy appears intended to express animus toward DACA recipients themselves, in part because of the federal government's policy toward them.   Such animus, however, is not a legitimate state interest.  "If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest."   *Romer v. Evans*, 517 U.S. 620, 634 (1996) (alterations and ellipsis omitted; emphasis in original).

In short, we agree with the district court that Plaintiffs demonstrated a likelihood of success on their equal protection claim.  The subsequent revision of Defendants' policy does not undermine this conclusion.  The current policy continues to permit the use of Employment Authorization Documents as proof of authorized presence for two sizeable groups of noncitizens similarly situated to DACA recipients.   The district court relied, in part, on that comparison in concluding that the Defendants' policy likely violates the Equal Protection Clause.  We agree that comparison remains apt, the partial change in policy notwithstanding.

In short, Defendants' policy remains likely to violate the Equal Protection Clause.

---

Stat. Ann. § 28-4135.  In light of this financial responsibility requirement, we are skeptical of Defendants' suggestion that DACA recipients' removal would leave accident victims without financial recourse.

### III. Likelihood of Irreparable Harm

Plaintiffs have also shown that, in the absence of a preliminary injunction, they are likely to suffer irreparable harm.

Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages. *See Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Because intangible injuries generally lack an adequate legal remedy, "intangible injuries [may] qualify as irreparable harm." *Id.*

Plaintiffs in this case have produced ample evidence that Defendants' policy causes them to suffer irreparable harm. In particular, Plaintiffs' inability to obtain driver's licenses likely causes them irreparable harm by limiting their professional opportunities. Plaintiffs' ability to drive is integral to their ability to work — after all, eighty-seven percent of Arizona workers commute to work by car. It is unsurprising, then, that Plaintiffs' inability to obtain driver's licenses has hurt their ability to advance their careers. Plaintiffs' lack of driver's licenses has prevented them from applying for desirable entry-level jobs, and from remaining in good jobs where they faced possible promotion. Likewise, one Plaintiff — who owns his own business — has been unable to expand his business to new customers who do not live near his home. Plaintiffs' lack of driver's licenses has, in short, diminished their opportunity to pursue their chosen professions. This "loss of opportunity to pursue [Plaintiffs'] chosen profession[s]" constitutes irreparable harm. *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165

(9th Cir. 2011); *see also Chalk v. U.S. Dist. Ct.*, 840 F.2d 701, 709–10 (9th Cir. 1988).

The irreparable nature of Plaintiffs' injury is heightened by Plaintiffs' young age and fragile socioeconomic position. Setbacks early in their careers are likely to haunt Plaintiffs for the rest of their lives. Thus, "a delay, even if only a few months, pending trial represents . . . productive time irretrievably lost" to these young Plaintiffs. *Chalk*, 840 F.2d at 710. Plaintiffs' entire careers may be constrained by professional opportunities they are denied today.

We are unpersuaded by Defendants' argument that Plaintiffs' ability to drive illegally means they cannot suffer harm from their inability to obtain driver's licenses. Laws are not irrelevant simply because they may be disobeyed. There can be no serious dispute that Defendants' policy hinders Plaintiffs' ability to drive, and that this (in turn) hinders Plaintiffs' ability to work and engage in other everyday activities.

No award of damages can compensate Plaintiffs' for the myriad personal and professional harms caused by their inability to obtain driver's licenses. Thus, Plaintiffs are likely to suffer irreparable harm in the absence of an injunction.

In arriving at a contrary conclusion, the district court applied the wrong legal standard. The district court required Plaintiffs to show that the harm they suffered in the absence of an injunction was "extreme or very serious," and not merely that this harm was irreparable. The district court required this "extreme" level of harm because it incorrectly believed Plaintiffs' requested injunction was mandatory. Plaintiffs' requested injunction is, in fact, prohibitory. *See*

*supra*, Part I. In this light, the district court erred by attempting to evaluate the severity of the harm to Plaintiffs, rather than simply determining whether the harm to Plaintiffs was irreparable.

When the correct legal standard is applied, the record makes clear that Plaintiffs are likely to suffer irreparable harm unless Defendants' policy is enjoined.

## IV.  Other Injunction Factors

Finally, by establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction.  "[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol*, 732 F.3d at 1029 (alteration and ellipsis in original). On the contrary, the public interest and the balance of the equities favor "prevent[ing] the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

## CONCLUSION

Plaintiffs have shown that they are likely to succeed on the merits of their equal protection claim, that they are likely to suffer irreparable harm unless Defendants' policy is enjoined, and that both the balance of the equities and the public interest favor an injunction. Thus, we REVERSE the district court's denial of a preliminary injunction. We REMAND with instructions to enter a preliminary injunction prohibiting Defendants from enforcing any policy by which

the Arizona Department of Transportation refuses to accept Plaintiffs' Employment Authorization Documents, issued to Plaintiffs under DACA, as proof that Plaintiffs are authorized under federal law to be present in the United States.

**REVERSED and REMANDED.**

---

CHRISTEN, Circuit Judge, joining the majority opinion and concurring as to Part II.A:

For the reasons explained in Judge Pregerson's opinion, I agree plaintiffs have demonstrated a likelihood of success on the merits of their equal protection claim. I further agree they have shown a likelihood of irreparable injury, and have satisfied the other prerequisites for injunctive relief. I write separately to express my view that plaintiffs have also demonstrated a likelihood of success on their preemption claim because Arizona's policy regulates immigration by creating a new classification of alien status. Arizona prohibits the issuance of driver's licenses to anyone who does not submit proof that his or her presence in the United States is "authorized under federal law," yet Arizona's newly-crafted definition of "authorized presence" is unmoored from and unsupported by federal law. When it adopted its new policy regarding driver's license eligibility, Arizona did not merely *borrow* a federal immigration classification; it created a new one. By doing so, Arizona ventured into an area—the creation of immigration classifications—that is the exclusive domain of the federal government.

\* \* \*

"[T]he 'power to regulate immigration is unquestionably . . . a federal power.'"  *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1974 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 354 (1976)).  Though not all state regulations touching on immigration are preempted, *id.*, states may not directly regulate immigration, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1876 (2014).

Arizona's policy does not expressly dictate who may be present in the United States; it ostensibly regulates who can get a state driver's license.  But the policy embodies the State's independent judgment that recipients of Deferred Action for Childhood Arrivals (DACA) are not "authorized" to be present in the United States "*under federal law*."  Ariz. Rev. Stat. Ann. § 28-3153(D) (emphasis added).  Interpreting this statutory language and, by necessity, federal law, the governor of Arizona announced in Executive Order 2012-06, that: "the Deferred Action program *does not and cannot confer lawful or authorized status or presence*" (emphasis added).  The Executive Order also announced the view that "[t]he issuance of Deferred Action or Deferred Action . . . employment authorization documents to unlawfully present aliens does not confer upon them any lawful *or* authorized status" (emphasis added).

In accord with the Executive Order, Arizona revised its driver's license policy in response to the announcement of the federal DACA program.  Arizona's revised policy reflects its position that beneficiaries of three types of relief from removal—DACA, regular deferred action, and deferred enforced departure—all lack authorized presence under federal law.  On appeal, defendants forthrightly acknowledge that this determination does not follow directly from any

particular federal law, but only from Arizona's separate interpretation of the federal immigration scheme. According to this interpretation: "DACA, regular deferred action, and deferred enforced departure have no basis in [federal] statute or regulation but rather reflect the federal executive's discretionary decision not to enforce federal law."[1]

Paradoxically, Arizona classifies as "authorized" two other groups of aliens that similarly lack lawful immigration status under federal law—recipients of (c)(9) and (c)(10) employment authorization documents—because, defendants claim, these groups are on a "path to legal status."[2] The terms "deferred action," "deferred enforced departure," and "lawful immigration status" all expressly appear in federal law. *See, e.g.*, 8 U.S.C. § 1227(d)(2) (deferred action); 8 C.F.R. § 1245.9(g)(4) (deferred enforced departure); 8 C.F.R. § 245.1(d)(1) (lawful immigration status). But no federal law expressly articulates or even implies the distinct concept of a "path to legal status." This novel gloss on the federal immigration scheme underlies Arizona's sub-classification of aliens lacking lawful status into two new groups, one of which it deems authorized to be present, and the other it deems "not authorized."

Plaintiffs argue that Arizona's policy is preempted by the United States Constitution as an impermissible regulation of

---

[1] The existence of this discretion is recognized in both the United States Code and the Code of Federal Regulations. *See, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (VI); 8 U.S.C. § 1227(d)(2); 8 C.F.R. § 245a.2(b)(5).

[2] As our opinion notes, recipients of (c)(9) and (c)(10) documents are noncitizens who have applied for adjustment of status and cancellation of removal, respectively. *See* 8 C.F.R. § 274a.12(c)(9)–(10).

immigration status. They claim that the Constitution reserves regulation of immigration to the federal government.[3] Plaintiffs point to language from the Supreme Court's decision in *De Canas* suggesting that a direct state regulation of immigration would be "constitutionally proscribed." 424 U.S. at 356; *see id.* at 352–56; *cf. Toll v. Moreno*, 458 U.S. 1, 10 (1982) ("[T]he preeminent role of the Federal Government with respect to the regulation of aliens. . . . derives from various sources, including the Federal Government's power '[t]o establish [a] uniform Rule of Naturalization,' U.S. Const., Art. I, § 8, cl. 4, its power '[t]o regulate Commerce with foreign Nations,' *id.*, cl. 3, and its broad authority over foreign affairs."). *De Canas* described "a regulation of immigration" as "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." 424 U.S. at 355. In *Whiting*, the Court cited *De Canas* and reaffirmed that regulation of immigration is a federal power. 131 S. Ct. at 1974. Even more recently, the Court in *Arizona v. United States* recognized that "[t]he federal power to determine immigration policy is well settled." 132 S. Ct. 2492, 2498 (2012).

It is unnecessary in this case to resolve whether a regulation of immigration is preempted under the Constitution or merely by statutory law. Even if such a regulation would not be directly preempted by the

---

[3] Arizona mischaracterizes plaintiffs' position as being that "any state law touching on immigration is constitutionally preempted." But plaintiffs recognize that the mere "fact that aliens are the subject of a state statute does not render it a regulation of immigration." *See De Canas*, 424 U.S. at 355.

Constitution,[4] it would still be subject to preemption based on "[t]he comprehensiveness of the [Immigration & Naturalization Act (INA)] scheme for regulation of immigration and naturalization."[5] *De Canas*, 424 U.S. at 359; *see Whiting*, 131 S. Ct. at 1973; *see also* Clare Huntington, *The Constitutional Dimension of Immigration Federalism*, 61 Vand. L. Rev. 787, 852 (2008) (arguing that "federal exclusivity in the admission and removal of non-citizens is better understood to rest on ordinary statutory preemption").

The Supreme Court's immigration jurisprudence recognizes that the occupation of a regulatory field may be "inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Arizona*, 132 S. Ct. at 2501 (quoting *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The Supreme Court has indicated that the INA provides a pervasive framework with regard to the admission, removal, and presence of aliens. *See Whiting*, 131 S. Ct. at 1973 (quoting *De Canas*, 424 U.S. at 353, 359); *cf. Arizona*, 132 S. Ct. at 2499 ("Federal governance of immigration and alien status is extensive and complex."). "The States enjoy no power with respect to the classification of aliens." *Plyler v. Doe*, 457 U.S. 202, 225 (1982). The Court continues to recognize that determinations regarding the presence of aliens in the

---

[4] I express no view on this question.

[5] *But see Valle del Sol Inc.*, 732 F.3d at 1023 (stating in dicta that "direct regulation of immigration" is "constitutionally proscribed").

United States "must be made with one voice."**[6]** *Arizona*, 132 S. Ct. at 2506–07.

Defendants counter that the State is free to adopt federal classifications in regulations concerning state matters, such as driver's licenses. But this raises the question whether this is all Arizona's new policy does, or whether it really amounts to an "additional or auxiliary regulation[]" of alien status. *See Arizona*, 132 S. Ct. at 2502 (quoting *Hines v. Davidowitz*,

---

**[6]** The panel majority and I have different views of the scope of the arguments plaintiffs raised in support of their motion for a preliminary injunction. There is no doubt that plaintiffs' memorandum in support of their motion unambiguously argued Arizona's policy is an impermissible regulation of immigration that intrudes upon the exclusive federal power to classify aliens for purposes of admission, removal, and presence. District Court Docket No. 30. Plaintiffs did expressly disavow that they are "asserting that the federal government has occupied the field of *regulation of driver's licenses*." Pls.' Opp'n to Defs.' Mot. to Dismiss, District Court Docket No. 91 at 8 n.6 (emphasis added). But the "regulation of immigration" argument addressed here is completely different, and plaintiffs raised it point-blank. The district court considered the argument at length, and rejected it. That plaintiffs did not frame their "regulation of immigration" argument specifically in terms of statutory preemption is consistent with their position that it is well established the Constitution directly preempts state regulation of immigration. My conclusion that plaintiffs' argument is likely to succeed is not based strictly on a statutory field preemption analysis. Rather, because this appeal should be resolved on the narrowest grounds available, it is not necessary to decide, at the preliminary injunction stage, whether the proper basis for preemption of Arizona's policy is statutory or constitutional. This prudential consideration does not mean I address a different argument from the one plaintiffs raised; plaintiffs expressly argued to the district court that Arizona's policy amounts to a regulation of immigration. Because the argument was "raised sufficiently for the trial court to rule on it," it was not waived. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992) (citation and internal quotation marks omitted).

312 U.S. 52, 66–67 (1941)).  Defendants contend that the State may employ its concept of a "path to status" to arrange existing federal classifications into its own definition of "authorized presence," so long as this definition does not stand "in direct conflict with formal immigration statuses and classifications that the INA expressly created."  But the classifications in federal immigration law are not Lego pieces that the State may shape into new patterns in an exercise of regulatory bricolage.  "Where Congress occupies an entire field, . . . even complementary state regulation is impermissible."[7]  *Id.*

Even a law ostensibly addressing a traditional subject of state concern, like driver's licenses, may effect an impermissible regulation of immigration.  This conclusion is consistent with Supreme Court precedent and decisions from other jurisdictions.  In *Toll*, for example, the Court held that preemption principles applied to a state policy concerning the imposition of tuition charges and fees at a state university on the basis of immigration status.  458 U.S. at 16–17.  Also, the Third Circuit recently held that municipal laws preventing unauthorized aliens from renting housing constituted an

---

[7] That this case involves classes of aliens the Executive has permitted to remain in the country pursuant to its discretion is a further consideration weighing against allowing a complementary state regulation of immigration here.  The Supreme Court has emphasized that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials."  *Arizona*, 132 S. Ct. at 2499.  And the Court has specifically recognized that federal statutes contemplate and protect the discretion of the Executive Branch when making determinations concerning deferred action.  *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484–86 (1999).  The discretion that is built into statutory removal procedures suggests that auxiliary state regulations regarding the presence of aliens in the United States would be particularly intrusive on the overall federal statutory immigration scheme.

impermissible regulation of immigration and were field preempted by the INA. *Lozano v. City of Hazleton*, 724 F.3d 297, 317 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 1491 (2014) (emphasis added). Though these housing laws did not directly dictate who should or should not be admitted to this country, the Third Circuit concluded that they nonetheless "intrude[d] on the regulation of residency *and presence* of aliens in the United States." *Id.* (emphasis added). Similarly, the Fifth Circuit recently held that an ordinance "allow[ing] state courts to assess the legality of a non-citizen's presence" in the United States was preempted because it "open[ed] the door to conflicting state and federal rulings on the question." *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1491 (2014). The Fifth Circuit's decision was based on its recognition that "[t]he federal government alone . . . has the power to classify non-citizens." *Id.* Here, the practical effects of Arizona's policy most directly relate to the regulation of state driver's licenses, but this does not shield the policy from preemption if the policy *also* functions as a regulation of immigration, i.e., a separate determination of alien status. *See United States v. Alabama*, 691 F.3d 1269, 1292–96 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 2022 (2013) (holding that a state law prohibiting courts from recognizing contracts involving unlawfully present aliens was preempted as "a thinly veiled attempt to regulate immigration under the guise of contract law").

Defendants are conspicuously unable to point to any federal statute or regulation that justifies classifying applicants for adjustment of status and cancellation of removal as authorized to be present, while excluding recipients of deferred action or deferred enforced departure. All of these groups similarly lack formal immigration status

but are allowed to live and work in the country for a period of time by the federal government. Lacking a specific foundation in federal statutory or regulatory law, defendants cite other sources to show that Arizona's definition of "authorized presence" at least tracks the federal scheme, but these efforts are equally unpersuasive.

First, defendants point to the "Frequently Asked Questions" (FAQ) section of the website for the United States Citizenship and Immigration Services. The answer to one of the questions states that although DACA recipients "do not accrue unlawful presence (for admissibility purposes) during the period of deferred action, deferred action does not confer any lawful status." But the position articulated on this website is entirely consistent with the Executive's discretionary authority to defer prosecution of some individuals without changing their formal immigration status. The "answer" in the FAQ section lends no support to Arizona because the terms "presence" and "status" are terms of art in the scheme of federal immigration law, and they are not necessarily interchangeable. *See Chaudhry v. Holder*, 705 F.3d 289, 291 (7th Cir. 2013) ("The Board [of Immigration Appeals has] acknowledged that 'unlawful presence' and 'unlawful status' are distinct concepts."); *Dhuka v. Holder*, 716 F.3d 149, 154–59 (5th Cir. 2013) (accepting the Board's distinction between presence and status and rejecting argument that an authorized stay pursuant to 8 U.S.C. § 1182(a)(9)(B)(ii) is equivalent to lawful status). More fundamentally, of course, it cannot be disputed that the FAQ section of a federal website is not a source of "federal law," nor would an interpretation announced there be subject to deference by a court.

Defendants also point to a Congressional Research Service Memorandum remarking that "[m]any observers characterize foreign nationals with relief from removal who obtain temporary work authorizations as 'quasi-legal' unauthorized migrants." The Memorandum states that such persons "may be considered 'lawfully present' for some very narrow purposes under the INA . . . but are otherwise unlawfully present." But the Memorandum cites no statutory or regulatory provision in support of this statement, and a research memorandum, like a website, is not federal law. It should also be noted that if Arizona were actually relying on the Memorandum's purported classification of "quasi-legal" unauthorized migrants, Arizona would not have made driver's licenses accessible to noncitizens with (c)(9) and (c)(10) work authorizations, because these noncitizens would also appear to fall under the purported "quasi-legal" classification.[8]

Not only does Arizona's classification of aliens with authorized presence lack a specific anchor in federal law, but the primary federal law concerning the status of aliens, the INA, points away from Arizona's interpretation. For purposes of determining the admissibility of aliens other than those lawfully admitted for permanent residence, the INA states that if an alien is present in the United States beyond a "period of stay *authorized* by the Attorney General" or without being admitted or paroled, the alien is "deemed to be *unlawfully present* in the United States." 8 U.S.C. § 1182(a)(9)(B)(ii) (emphases added). The administrative regulations implementing this section of the INA, to which

---

[8] Under the classification suggested by the Memorandum, recipients of (c)(9) and (c)(10) authorizations are, like DACA recipients, "foreign nationals with relief from removal who obtain temporary work authorizations."

we owe deference, establish that deferred action recipients do not accrue "unlawful presence" under § 1182(a)(9)(B) for purposes of calculating when they may seek admission to the United States.      8 C.F.R. § 214.14(d)(3), 28 C.F.R. § 1100.35(b)(2).  Because such recipients are present without being admitted or paroled, their stay must be considered "authorized by the Attorney General," at least for purposes of § 1182(a)(9)(B).[9]

Defendants argue that the INA's definition of "unlawful presence" applies only "for the narrow purpose of stopping the accrual of unlawful presence used to calculate future bars to admissibility."      They claim that, under the federal immigration scheme, DACA recipients may be "authorized" for some purposes but not others.[10]  From there, defendants assert that Arizona "could *separately* and validly determine DACA recipients do not have authorized or lawful presence for purposes of Arizona's driver's license statute, without running afoul of any federal immigration laws" (emphasis added).  But as discussed, where Congress has created a

---

[9] Another federal statute, the REAL ID Act, is also consistent with the INA's definition of "unlawful presence."  REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231.  This law provides that states may issue a driver's license or identification card to persons who can demonstrate an "authorized stay in the United States." *Id.* § 202(c)(2)(C)(i)–(ii).  Persons with "approved deferred action status" are expressly identified as being present in the United States during a "period of authorized stay," for the purpose of issuing state identification cards.  *Id.* § 202(c)(2)(B)(viii), (C)(ii).  The REAL ID Act further weighs against Arizona's efforts to justify its classification under federal law.

[10] For example, Arizona notes that a Department of Health and Human Services regulation has carved out DACA recipients from the definition of "lawful presence" for purposes of eligibility for certain benefits under the Affordable Care Act.  45 C.F.R. § 152.2(8).

pervasive regulatory scheme, such as for the classification of alien status, a state may not "supplement" federal law. *Arizona*, 132 S. Ct. at 2501.

In sum, defendants offer no plausible foundation for an interpretation of federal law that classifies individuals with (c)(9) and (c)(10) work authorization documents as having "authorized presence," but not DACA recipients.  At the same time, defendants ignore the use of the terms "authorized" and "presence" in the INA, the statute that provides the most comprehensive scheme relating to the admissibility and status of aliens.  *See Whiting*, 131 S. Ct. at 1973.  Finally, defendants appear to have conflated the statutory terms "presence" and "status," while also applying them inconsistently.

Plaintiffs are therefore likely to succeed in their argument that Arizona's policy for issuing driver's licenses is an impermissible regulation of immigration status because the policy relies on Arizona's separate and unsupported determination of who is authorized to be present in the United States under federal law.  It is unnecessary at this stage to decide whether the appropriate basis for the preemption of state regulation of immigration lies in the federal constitution or in the comprehensive statutory scheme for the determination of alien status.  Our panel is only called upon to gauge whether plaintiffs are entitled to preliminary injunctive relief.  Because the Supreme Court has consistently cautioned that the regulation of immigration is an exclusively federal function, and because plaintiffs have persistently and persuasively argued that Arizona's revised policy creates a new classification of alien status, I conclude that plaintiffs are entitled to preliminary injunctive relief under this theory.