**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SALOMON LEDEZMA-COSINO, AKA Cocino Soloman Ledesma, *Petitioner*, | No. 12-73289 |
| v. | Agency No. A091-723-478 |
| LORETTA E. LYNCH, Attorney General, *Respondent*. | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
July 10, 2015—Pasadena, California

Filed March 24, 2016

Before: Stephen Reinhardt and Richard R. Clifton, Circuit
Judges and Miranda M. Du,* District Judge.

Opinion by Judge Reinhardt;
Dissent by Judge Clifton

---

* The Honorable Miranda M. Du, District Judge for the U.S. District
Court for the District of Nevada, sitting by designation.

## SUMMARY[**]

### Immigration

The panel granted Salomon Ledezma-Cosino's petition for review of the Board of Immigration Appeals' decision finding him ineligible for cancellation of removal or voluntary departure because he lacked good moral character as a "habitual drunkard" under 8 U.S.C. § 1101(f)(1).

The panel held that Ledezma-Cosino is barred from raising a due process claim, but he could bring an equal protection challenge because it does not require a liberty interest. The panel held that § 1101(f)(1) is unconstitutional under the Equal Protection Clause because there is no rational basis to classify people afflicted by chronic alcoholism as innately lacking good moral character. The panel remanded for further proceedings in light of the opinion.

Dissenting, Judge Clifton wrote that the opinion disregards the legal standard to be applied, and that § 1101(f)(1) should easily clear the very low bar of the rational basis test. Judge Clifton would find that the majority opinion includes several false legal premises, and it relies upon the false factual dichotomy that diagnosis of chronic alcoholism as "medical" means there can be no element of drunkenness subject to free will or susceptible to a moral evaluation.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Nora E. Milner (argued), Milner & Markee, LLP, San Diego, California, for Petitioner.

Lisa M. Damiano (argued), Stuart F. Delery, Benjamin C. Mizer, and Terri J. Scadron, United States Department of Justice, Office of Immigration Litigation, Washington D.C., for Respondent.

**OPINION**

REINHARDT, Circuit Judge:

The Board of Immigration Appeals (BIA) determined that Petitioner Salomon Ledezma-Cosino was not eligible for cancellation of removal or voluntary departure because, under 8 U.S.C. § 1101(f)(1), as a "habitual drunkard"—that is, a person with chronic alcoholism—he inherently lacked good moral character. He now petitions for review, contending that the Due Process Clause and Equal Protection Clause of the Constitution forbid the Government from making such an irrational classification as to moral character on the basis of a medical disability. We hold that, under the Equal Protection Clause, a person's medical disability lacks any rational relation to his classification as a person with bad moral character, and that § 1101(f)(1) is therefore unconstitutional. We grant the petition for review, vacate the BIA's decision, and remand for further proceedings in light of this opinion.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 8 U.S.C. § 1252(a)(2)(D) to review constitutional claims raised upon a petition for review. *Cabrera-Alvarez v. Gonzales*, 423 F.3d 1006, 1009 (9th Cir. 2005). This includes any alleged "colorable constitutional violation." *Martinez-Rosas v. Gonzales*, 424 F.3d 926, 930 (9th Cir. 2005). As the BIA lacks jurisdiction to rule upon the constitutionality of the statutes it administers, *In re Fuentes-Campos*, 21 I. & N. Dec. 905 (BIA 1997), it did not rule on the constitutional claim raised by petitioner. We review that claim de novo. *Chavez-Perez v. Ashcroft*, 386 F.3d 1284, 1287 (9th Cir. 2004).

## BACKGROUND

Even when the government may deport a non-citizen, the Attorney General has the discretion not to do so by, among other avenues, cancelling the removal under 8 U.S.C. § 1229b or allowing the non-citizen to voluntarily depart the country under 8 U.S.C. § 1229c. Each of these avenues provides a benefit for the non-citizen. The benefit of cancellation is obvious: the non-citizen may remain in the country. Voluntary departure's benefit is less intuitive, but no less important to the many non-citizens who receive this form of relief. If a non-citizen can voluntarily depart rather than be deported, "he or she avoids extended detention pending completion of travel arrangements; is allowed to choose when to depart (subject to certain constraints); and can select the country of destination. And, of great importance, by departing voluntarily the alien facilitates the possibility of readmission." *Dada v. Mukasey*, 554 U.S. 1, 11 (2008).

Congress limited eligibility for cancellation or voluntary departure to non-citizens of "good moral character." 8 U.S.C. §§ 1229b(b)(1)(B); 1229c(b)(1)(B).  Given the presumed difficulty of enumerating traits demonstrating good moral character, the relevant statute defines good moral character by listing the categories of people who lack it.  8 U.S.C. § 1101(f).  This list includes, among others, people who have participated in genocide or torture, been convicted of an aggravated felony or several gambling offenses, spent 180 days in custody as a result of a conviction or convictions, lied to obtain a benefit in immigration proceedings, and people who are "habitual drunkard[s]."  *Id*. (containing full list).  Any person deemed to lack good moral character may not be considered for discretionary relief.

Ledezma-Cosino is a person who was determined to lack good moral character by virtue of his classification as a "habitual drunkard" under the statutory provision.  He is a citizen of Mexico who entered the United States in 1997 without being legally admitted and has been in the country since that time except for a few brief departures.  He has eight children, five of whom are United States citizens.  He supports his family by working in the construction industry.

He is also a chronic alcoholic or a "habitual drunkard." His medical records state that he has a ten-year history of alcohol abuse, during which he drank an average of one liter of tequila each day.  Examining doctors have diagnosed him with acute alcoholic hepatitis, decompensated cirrhosis of the liver, and alcoholism.  His abuse of alcohol has led to at least one DUI conviction.

Immigration and Customs Enforcement (ICE) detained Ledezma-Cosino in 2008.  Over several hearings in front of

the Immigration Judge (IJ), he conceded removability but sought cancellation of removal or voluntary departure. The IJ denied relief for several reasons, but the BIA affirmed solely on the ground that Ledezma-Cosino was ineligible because he lacked good moral character as a "habitual drunkard." The BIA recognized that Ledezma-Cosino raised a constitutional argument about this classification but noted that it does not have jurisdiction over constitutional issues.

Following the BIA's denial of his appeal from the IJ, Ledezma-Cosino petitioned for review. After oral argument, we ordered supplemental briefing on the question whether § 1101(f)(1) violates due process or equal protection on the ground that chronic alcoholism is a medical condition not rationally related to the presence or absence of good moral character.

## DISCUSSION

Ledezma-Cosino argues that the denial of his request for cancellation of removal or voluntary departure on the ground that he lacks good moral character because he is "a habitual drunkard" deprives him of due process and equal protection of the law. We first address whether he has a protectable liberty interest for his due process claim and then turn to his equal protection argument.

## I

The Government first argues that Ledezma-Cosino is unable to raise a due process or equal protection claim because non-citizens lack a protectable liberty interest in discretionary relief. We agree that non-citizens cannot challenge denials of discretionary relief under the due process

clause because they do not have a protectable liberty interest in a privilege created by Congress. *Tovar-Landin v. Ashcroft*, 361 F.3d 1164, 1167 (9th Cir. 2004); *Munoz v. Ashcroft*, 339 F.3d 950, 954 (9th Cir. 2003). An equal protection claim, however, does not require a liberty interest. *Sandin v. Conner*, 515 U.S. 472, 487 & n.11 (1995) (holding that prisoner had no liberty interest for the purpose of the due process clause, but that he may nonetheless challenge arbitrary state action under the equal protection clause). Accordingly, Ledezma-Cosino is barred from raising a due process claim but may raise an equal protection challenge.

## II.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Supreme Court has long held that the constitutional promise of equal protection of the laws applies to non-citizens as well as citizens. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Although Congress's power to regulate the exclusion or admission of non-citizens is extremely broad, *see Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *Perez-Oropeza v. INS*, 56 F.3d 43, 45 (9th Cir. 1995), a classification between non-citizens who are otherwise similarly situated nevertheless violates equal protection unless it is rationally related to a legitimate government interest, *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 603 (9th Cir. 2002). Here, the government interest is in excluding persons of bad moral character. The Government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render

the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446. The absence of a rational relationship between a medical disease and bad moral character therefore renders any classification based on that relationship a violation of the Equal Protection Clause.

At the outset, it is apparent from the face of the statute that Congress has created a classification dividing "habitual drunkards"—i.e. persons with chronic alcoholism—from persons who do not suffer from the same disease and identifying the former as necessarily lacking good moral character. Although acknowledging the classification, the Government maintains that the statute does not target a status (alcoholism) but rather specific symptoms (habitual and excessive drinking) and that we therefore should not be concerned that the statute classifies a medical condition as constituting bad moral character. The Government is wrong. Just as a statute targeting people who exhibit manic and depressive behavior would be, in effect, targeting people with bipolar disorder and just as a statute targeting people who exhibit delusional conduct over a long period of time would be, in effect, targeting individuals with schizotypal personality disorder, a statute targeting people who habitually and excessively drink alcohol is, in effect, targeting individuals with chronic alcoholism. *Cf. Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 689 (2010) (declining to distinguish between status and conduct in cases in which the conduct was intertwined with the status). The Government's argument does not in fact advance the resolution of the issue before us. It simply states the obvious. Every person who is, by definition, a habitual drunkard will regularly exhibit the symptoms of his disease by drinking alcohol excessively. *See* Black's Law Dictionary (10th ed. 2009) (defining "habitual

drunkard" as "someone who consumes intoxicating substances excessively; esp., one who is often intoxicated," and "[a]n alcoholic").

Given the classification in the statute, the question becomes whether Congress's disparate treatment of individuals with alcoholism is "rationally related to a legitimate state interest" in denying discretionary relief to individuals who lack good moral character. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1065 (9th Cir. 2014). In other words, is it rational for the government to find that people with chronic alcoholism are morally bad people solely because of their disease?

The answer is no. Here, the Government concedes that alcoholism is a medical condition, as we have long recognized to be the case. *Griffis v. Weinberger*, 509 F.2d 837, 838 (9th Cir. 1975) ("The proposition that chronic acute alcoholism is itself a disease, 'a medically determinable physical or mental impairment,' is hardly debatable today."). Like any other medical condition, alcoholism is undeserving of punishment and should not be held morally offensive. *Powell v. Texas*, 392 U.S. 514, 549–51 (1968) (White, J., concurring) (describing chronic alcoholism as a "disease" and stating that "the chronic alcoholic with an irresistible urge to consume alcohol should not be punishable for drinking or for being drunk"). Although people with alcoholism continue to face stigma, "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *City of Cleburne*, 473 U.S. at 448 (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984)). We are well past the point where it is rational to link a person's medical disability with his moral character.

The Government first argues that persons suffering from alcoholism are morally blameworthy because they simply lack the motivation to overcome their disease. The study on which the Government relies, W.R. Miller, *Motivation for Treatment: A Review With Special Emphasis on Alcoholism*, 98 Psychological Bulletin 84, (1985) (Ex. A), does not support the proposition that alcoholics lack motivation. The study actually refutes the proposition urged by the Government, noting that the "trait model," according to which alcoholics employ defense mechanisms because they lack sufficient motivation to stop drinking,

> ha[s] failed to find support in the empirical literature. Extensive searches for "the alcoholic personality" have revealed few definitive traits or patterns typical of alcoholics beyond those directly attributable to the effects of overdrinking. The character defense mechanism of denial has been found to be no more frequent among alcoholics than among nonalcoholics.

*Id.* Put differently, the theory that alcoholics are blameworthy because they could simply try harder to recover is an old trope not supported by the medical literature; rather, the inability to stop drinking is a function of the underlying ailment.

The Government's position to the contrary has deplorable, troubling, and wholly unacceptable implications. Taking the Government's logic as true, a disproportionate number of today's veterans, many of whom suffer from Post Traumatic Stress Disorder, would lack good moral character because they are consumed by—and cannot overcome—their

alcoholism.  *See* Andrew Saxon, *Returning Veterans with Addictions*, Psychiatric Times (July 14, 2011), http://www.psychiatrictimes.com/military-mental-health/ returning-veterans-addictions/ (noting that 12% to 15% of recently deployed veterans to Iraq tested positive for alcohol problems); Thomas Brinson & Vince Treanor, *Vietnam Veterans and Alcoholism*, The VVA Veteran (August 1984), *http://www.vva.org/archive/TheVeteran/2005_03/ feature_alcoholism.htm* ("[Thirty-six] percent of the Vietnam veterans studied demonstrated alcoholism or significant alcohol-related problems which could develop into alcoholism."); National Center for PTSD, Department of Veterans Affairs, http://www.ptsd.va.gov/public/ problems/ptsd_substance_abuse_veterans.asp  (noting that PTSD and substance abuse often occur simultaneously in veterans and that 1 in 10 returning soldiers from Iraq and Afghanistan seen at Veterans Affairs hospitals have a substance abuse problem); Magdalena Cérda et al., *Civilian Stressors Associated with Alcohol Use Disorders in the National Guard*, 47 Am. J. of Preventative Med. 461 (2014) (noting that soldiers in the National Guard have double the rate of alcohol abuse and linking this high rate to civilian stressors—including family disruption, problems with health insurance, and legal problems—caused by intermittent deployment).  A disproportionate number of Native Americans similarly would be classified as lacking good moral character under the Government's theory. *See* RJ Lamarine, *Alcohol Abuse Among Native Americans*, 13  J. Community Health 143, 143 (1988) ("Epidemiological data indicate that elevated morbidity and mortality attributable to alcohol abuse among [Native Americans] remain at epidemic levels."); Palash Ghoash, *Native Americans: The Tragedy of Alcoholism*, International Business Times (Feb. 11, 2012), http://www.ibtimes.com/native-americans-tragedy-

alcoholism-214046 ("According to the Indian Health Services, the rate of alcoholism among Native Americans is six times the U.S. average."); Patricia Silk-Walker et al., *Alcoholism, Alcohol Abuse, and Health in American Indians and Alaska Natives*, 1 Am. Indian and Alaska Native Mental Health Res. 65 (1988) ("[Four] of the top 10 causes of death among American Indians are attributable in large part to alcohol abuse . . . ."). Finally, a disproportionate number of people who are homeless would not only be deprived of the government assistance they so desperately need but they would be officially condemned as bad people, undeserving of such help. Dennis McCarty et al., *Alcoholism, Drug Abuse, and the Homeless*, 46 Am. Psychologist 1139 (1991) (citing credible estimates that alcohol abuse affects 30% to 40% of homeless persons); Substance Abuse & Mental Health Servs. Admin., *Current Statistics on the Prevalence and Characteristics of People Experiencing Homelessness in the United States*, at 2 (2011) (same). Surely, the Government does not seriously assert that the veterans of the wars in Vietnam, Iraq, and Afghanistan who suffer from chronic alcoholism, as well as a highly disproportionate number of Native Americans, and a substantial portion of America's homeless population are all people of bad moral character.

The Government next contends that individuals suffering from habitual alcoholism have bad moral character because they "are at an increased risk of committing acts of violence or self-harm," citing several studies to the effect that alcoholism leads to the commission of certain crimes. *See* D.W. Webster & J.S. Vernick, *Keeping Firearms From Drug and Alcohol Abusers*, 15 Inj. Prev. 425 (2009) (Ex. B) (arguing that alcohol abusers should be barred from acquiring firearms because of the increased risk of violence); Phyllis W. Sharps et al., *The Role of Alcohol Use in Intimate Partner*

*Femicide*, 10 Am. J. Addictions 122, 133 (2001) (Ex. C) (discussing the link between alcohol and intimate partner violence); Frederick P. Rivara et al., *Alcohol and Illicit Drug Abuse and the Risk of Violent Death in the Home*, 278 JAMA 569 (1997) (Ex. D) (noting that alcohol abuse is linked to being a victim of homicide and suicide); Gary M. McClelland et al., *Alcohol Intoxication and Violent Crime: Implications for Public Health Policy*, 10 Am. J. Addictions 70 (2000) (Ex. E) (tracing the relation between police encounters and alcohol). Several of these studies have no link to moral culpability at all; even the Government would concede that being a victim of a crime or committing suicide does not show poor moral character. More important, the link between alcohol and violence does not make being the victim of the disease of alcoholism equivalent to possessing poor moral character. Indeed, although individuals with bipolar disorder have a lifetime incidence of aggressive behavior 14 to 25 percentage points higher than average and are at greater risk of self-harm, Jan Volavka, *Violence in Schizophrenia and Bipolar Disorder*, 25 Psychiatria Danubina 24, 27 (2013); KR Jamison, *Suicide and Bipolar Disorder*, 61 *J. Clinical Psychiatry* 47–51 (2000), no one would suggest that people with bipolar disease lack good moral character. Alcoholism is no different. On a similar note, the Government points to state laws that bar individuals with alcoholism from carrying firearms and policies that bar individuals with alcoholism from obtaining residence at the U.S. Soldiers' and Airmen's Home as evidence that people with alcoholism pose a particular moral threat. These examples are irrelevant. Unlike the statute at issue, these policies are designed for a different purpose—the avoidance of unnecessary conflict—

not to limit activities of alcoholics because they lack good moral character.[1]

The Government last argues that "habitual drunkards have been the target of laws intending to protect society since the infancy of the nation" and that such history proves the rationality of the legislation. History is a useful guide in this case, but it undercuts rather than buttresses the Government's argument. Because of the failure to understand mental illness, people with mental disabilities have in the past faced severe prejudice. *City of Cleburne*, 473 U.S. at 438. The very article the Government cites points to a darker origin for the targeting of habitual drunkards by immigration laws. The article contends that the laws, passed in the mid-1950s, "operated as forms of social control over immigrants and were driven by economic, political and xenophobic impulses" rather than a concern over moral character. Jayesh Rathod, *Distilling Americans: The Legacy of Prohibition on U.S. Immigration Law*, 51 Hous. L. Rev. 781, 846 (2013); *see also id.* at 823. As we recently learned in the context of laws discriminating on the basis of sexual orientation, "new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015). These new insights are particularly common in the field of mental

---

[1] What actions may be taken to limit the possibility that individuals suffering from chronic alcoholism will commit criminal acts is another question, one not necessary for us to consider here, although banning them from possessing firearms or driver's licenses are obvious areas for consideration. Similarly, when or how persons with chronic alcoholism may be punished for criminal acts committed while in an alcoholic state is another question to be considered elsewhere. None of this has anything to do, however, with whether individuals suffering from the disease of alcoholism are innately without good moral character.

health, where the Supreme Court has shifted from upholding sterilization of the mentally ill, notoriously declaring that "[t]hree generations of imbeciles are enough," *Buck v. Bell*, 274 U.S. 200, 207 (1928), to deploring the "grotesque mistreatment" of those with intellectual and mental disabilities, *City of Cleburne*, 473 U.S. at 438. Here, the over half-century that has passed since the "habitual drunkard" clause took effect has provided similar new insights in treating alcoholism as a disease rather than a character defect.

If anything, history tells us that animus was the impetus behind the law. That animus, of course, "is not a legitimate state interest." *Ariz. Dream Act*, 757 F.3d at 1067 (citing *Romer v. Evans*, 517 U.S. 620, 634 (1996)). We have also been taught through the passage of time that classifying alcoholics as evil people, rather than as individuals suffering from a disease, is neither rational nor consistent with our fundamental values. In sum, the Government's reliance on history not only fails to support the singling out of chronic alcoholics as without moral character but tells us that such a classification is violative of the Equal Protection Clause of our Constitution.

## CONCLUSION

There is no rational basis for classifying persons afflicted by chronic alcoholism as persons who innately lack good moral character. As such, we hold 8 U.S.C. § 1101(f)(1) unconstitutional, vacate the BIA's decision, and remand for further proceedings consistent with this opinion.

**VACATED and REMANDED**.

CLIFTON, Circuit Judge, dissenting:

The words "equal protection" did not appear in the opening brief filed on behalf of Petitioner Solomon Ledezma-Cosino.  Given that, it is not surprising that they did not appear in the government's answering brief, either.  Ledezma did not file a reply brief.  So how did the issue arise?

The argument deemed persuasive in the majority opinion is an argument of the majority's own creation.  Ledezma did not make that argument until urged to do so by the majority at oral argument and via a subsequent order for supplemental briefing.  Perhaps that pride of authorship helps to explain why the majority finds the argument persuasive, despite its obvious and multiple flaws.

Our decision in this case disregards the legal standard to be applied.  The "rational basis" test sets a very low bar, and Congress has exceptionally broad power in determining which classes of aliens may remain in the country.  The statute at issue here, 8 U.S.C. § 1101(f)(1), should easily clear that bar.

It does not, in the majority's view, only because the majority relies upon a false factual dichotomy – that diagnosis of the condition of chronic alcoholism as "medical" means that there can be no element of drunkenness that is subject to free will or susceptible to a moral evaluation.  The majority then goes on to hold that it is irrational for Congress to have reached a conclusion on that subject contrary to the majority's own view.  Specifically, the majority assumes that a person found to be a habitual drunkard is in that state only because of factors beyond his control, such that it is irrational to hold him accountable for it.  But chronic alcoholics do not

have to be habitual drunkards. Ledezma himself puts the lie to the majority's assumed premise, because despite his alcoholism, and to his credit, the record in this case tells us that he ultimately overcame that condition and stopped drinking.

I respectfully dissent.

## I.   The Legal Standard

The majority opinion concludes that 8 U.S.C. § 1101(f)(1) fails the rational basis test. That means that the statute, in the words of the majority opinion, at 7–8, is not "rationally related to a legitimate government interest" and its "'relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.'" (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985)).

The rational basis test does not set a standard that is tough to satisfy. A legislative classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). Federal statutes enjoy "a strong presumption of validity," "and those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it[.]'" *Id.* at 314–15 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). Rational basis review does not provide "a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313.

The rational basis test is particularly forgiving in the context of immigration policy. "[O]ver no conceivable

subject is the legislative power of Congress more complete than it is over the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Likewise, "the right to terminate hospitality to aliens," and "the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control." *Id.* "In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 511 (2003).

## II. False Factual Premise

The majority begins with a false factual dichotomy – that diagnosis of the condition of chronic alcoholism as "medical" means that there can be no element of drunkenness that is subject to free will or susceptible to a moral evaluation. But if chronic alcoholics really had no ability to control their conduct, then such individuals would never be able to stop drinking. We know that is not the case, as Ledezma himself laudably demonstrated. Chronic alcoholics do not have to be habitual drunkards.

The majority, in disregard of the standard of review, discredited scientific and behavioral evidence tending to establish the volitional component of alcoholism that is properly subject to moral evaluation. One study cited by the government collected reams of scientific literature addressing the dominant view that "motivation" is a critical component of positive treatment outcomes. *See* William R. Miller, *Motivation for Treatment: A Review With Special Emphasis on Alcoholism*, 98 Psychological Bulletin 84 (1985) (recounting survey evidence that among alcoholism treatment

personnel "75% believed patient motivation to be important to recovery, and 50% viewed it as essential"). The study noted that "motivation is frequently described as a prerequisite and a *sine qua non* for treatment, without which the therapist can do nothing[.]" *Id.* Endorsing that concept, the author concluded that motivation could be increased by "setting demanding but attainable goals." *Id.* at 99. Put differently, the Miller study showed that chronic alcoholics who received consistent reinforcement for their daily decision not to drink were more likely to avoid relapsing into habitual intoxication.

The majority opinion, at 10, discredits reliance on the Miller study by mischaracterizing the government's argument. The majority argues that the study does not support the proposition that alcoholics lack motivation and notes that the study discredits what is known as the "trait model." But the government never argued that alcoholics lack motivation or that they fit a specific trait model. It argued only that habitual drunkenness has a volitional component. That point is amply supported by the Miller study and by the voluminous literature it discussed. By contrast, the position favored by the majority – that alcoholics have no ability to refrain from habitual drunkenness – finds very little support in the scientific literature. *See, e.g.*, Am. Psych. Assoc., *Diagnostic and Statistical Manual of Mental Disorders* 490, 493 (5th ed. 2013) (explaining that "[a]lcohol use disorder is often erroneously perceived as an intractable condition").

Even if the issue were debatable, that does not provide a license for the majority to override Congress. "[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or

empirical data." *Beach Communications*, 508 U.S. at 315. Congress could have rationally speculated that chronic alcoholism has a volitional component. Therefore, it could rationally exclude habitual drunkards from discretionary deportation benefits because such individuals engage in volitional conduct that imposes a significant burden on public health and safety.

## III.    False Legal Premises

The majority also engages several false legal premises.

### A.    *The Majority Misidentifies the Goal of the Statute*

The majority opinion, at 9, identifies the central question in this case as whether it is "rational for the government to find that people with chronic alcoholism are morally bad people solely because of their disease[.]"    But that is decidedly not the question that is before the court. The real question is whether "there is any reasonably conceivable state of facts that could provide a rational basis for" denying discretionary deportation benefits to habitual drunkards. *Beach Communications*, 508 U.S. at 313. The answer should be obvious. Congress has unquestionable power to exclude certain groups of aliens regardless of any moral culpability. *See Kim*, 538 U.S. at 521–22. This is particularly true where the identified group threatens or even simply burdens institutions of public health and safety.

Such is the case here. The impacts of alcohol abuse on crime and public safety are "extensive and far-reaching." U.S. Dep't of Justice, *Alcohol and Crime* 2 (1998). "About 3 million violent crimes occur each year in which victims perceive the offender to have been drinking at the time of the

offense." *Id.* at 5. "Two-thirds of victims who suffered violence by an intimate . . . reported that alcohol had been a factor. Among spouse victims, 3 out of 4 incidents were reported to have involved an offender who had been drinking." *Id.* Approximately "40% of individuals in the United States experience an alcohol-related adverse event at some time in their lives, with alcohol accounting for up to 55% of fatal driving events." *DSM V*, *supra*, at 496.

The majority responds, at 13, by invoking its false framework. It argues that "the link between alcohol and violence does not make being the victim of the disease of alcoholism equivalent to possessing poor moral character." That is irrelevant to the real question in this case, which is whether Congress had a rational basis for excluding habitual drunkards from discretionary deportation benefits. Clearly it did. The demonstrable link between alcohol use and violence firmly establishes the rationality of 8 U.S.C. § 1101(f).

## B. *A Medical Condition Is Not a Constitutional Talisman*

Another false legal premise is the majority's apparent view that Congress could not rationally exclude a category of aliens on the basis of a medical condition. But the government's ability to exclude individuals is "exceptionally broad." *Fiallo v. Bell*, 430 U.S. at 792. Does the majority seriously doubt the government's ability to exclude individuals infected with the Ebola virus or individual carriers of antibiotic-resistant bacteria from this country? Or perhaps the majority believes that because a condition is medically describable, it is impervious to moral judgment. But we know that cannot be the case. Pedophilia is a medically describable condition that can overwhelm an individual's decision-making capacity, and yet nothing would

or should prevent Congress from excluding known pedophiles under the framework of moral character. In short, the bare fact that a condition is medically describable does not create a constitutional talisman that exempts the afflicted from Congress's legitimate immigration policies.

## C.  *Ledezma Failed to Identify Similarly Situated Groups*

At the majority's encouragement, Ledezma submitted a supplemental brief arguing that it was irrational to distinguish between habitual drunkards and individuals with heart disease, cancer, diabetes, syphilis, and HIV. But these groups are not similarly situated to habitual drunkards "in those respects relevant to [Congress's] policy." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1064 (9th Cir. 2014). At a broad level, there is no evidence that the undifferentiated class of individuals with "medical diseases" are responsible for 3 out of 4 instances of spousal abuse, 55% of fatal driving events, or 3 million violent crimes per year. Even descending to the particulars, Ledezma proffered no evidence that individuals suffering from the conditions that he listed pose the same kind of threat to public safety as habitual drunkards. Because these groups are not similarly situated with respect to the government's legitimate policy interest, Congress had a rational basis for treating habitual drunkards differently.

Moreover, nobody chooses to have heart disease, cancer, diabetes, or other such diseases. There is a volitional element to habitual drunkenness that distinguishes that condition from diseases generally. To be sure, there are connections between lifestyle choices and some other medical conditions, such as between smoking and lung cancer. But it is not irrational for Congress to view that connection as substantially more

attenuated or to decide to treat those afflicted with those diseases differently than those who are habitual drunkards.

The majority, dissatisfied with Ledezma's selection of control groups and undeterred by the fact that it is the petitioner's burden to negative every conceivable basis in support of the statute, argues, at 13, that it is irrational to distinguish between chronic alcoholics and individuals with bipolar disorder, because individuals with bipolar disorder also have an increased incidence of aggressive and violent behavior. But habitual drunkards are distinguishable from individuals with bipolar disorder. Whereas the contribution of alcohol to crimes of violence is substantial, "the contribution of people with mental illnesses to overall rates of violence is small," and "the magnitude of the relationship is greatly exaggerated in the minds of the general population." Institute of Medicine, *Improving the Quality of Health Care for Mental and Substance-Use Conditions* 103 (2006). Congress had a rational basis for distinguishing between the mentally ill and habitual drunkards – habitual drunkards pose a far more serious threat to public health and safety.

Even if the classification chosen by Congress was arguably under-inclusive, that is not a rational basis problem. A statute does not fail rational-basis review merely because it was "not made with mathematical nicety or because in practice it results in some inequality." *Heller v. Doe*, 509 U.S. 312, 321 (1993) (quotation marks and citation omitted).

In sum, none of the groups that Ledezma cited are similarly situated to habitual drunkards in the respects relevant to Congress's exclusion.

### D. The Majority Applies Heightened Scrutiny By Stealth

The rational basis test sets out a standard that is not difficult to satisfy. Statutory classifications enjoy "a strong presumption of validity." *Beach Communications*, 508 U.S. at 314. "[T]hose attacking the rationality of the legislative classification have the burden to negative every conceivable basis that might support it[.]" *Id.* at 315 (internal quotation marks and citation omitted). Courts must refrain from engaging in "courtroom fact-finding" and must indulge every reasonable inference in support of a statute. *Id.* "Where there are plausible reasons for Congress' action, our inquiry is at an end." *Id.* at 313–14 (internal quotation marks and citation omitted).

These standards are common grist for the appellate mill, yet the majority opinion bypasses them almost entirely. Nowhere does the majority apply a presumption of constitutionality. Nowhere does it hold the Petitioner to his burden of negating every conceivable rationale offered in support of the law. It rejects as unpersuasive the scientific and behavioral data indicating that overcoming chronic alcoholism involves free will. The majority opinion is cast in the language of rational basis review, but it sidesteps the essential question, which is whether Congress had a rational basis for excluding habitual drunkards from discretionary deportation benefits.

The majority prefers to focus on Congress's manner of acting, i.e., its use of a moral character framework. But whether Congress chose the best method to do something that it undoubtedly has the authority to do is the stuff of narrow tailoring. In short, the majority opinion has applied heightened scrutiny by stealth, and in so doing, has usurped

Congressional authority in an area where that authority is at its apex.

## IV.  The Pointlessness of This Decision

I cannot help but wonder about the point of the exercise undertaken by the majority opinion.  That Congress has the power to exclude aliens with medical conditions is unquestioned, even though there is no fault or moral component to most diseases.  There are reasons for Congress to decide that the country should not accept or harbor sick aliens who might infect others or whose treatment might impose heavy costs.  There are reasons for Congress to decide that habitual drunkards in particular should be excluded because of the harm they might do to others and the heavy costs that their presence might impose on this country. Nobody has contended that it would be irrational for Congress directly to provide that aliens who are habitual drunkards are ineligible for cancellation of removal.  The majority simply doesn't like the way that Congress has accomplished that result, by way of the requirement for "good moral character."  But what good does the majority opinion really accomplish by preventing Congress from doing something that it surely could do directly?  I do not see the point.

## V.  Conclusion

The rational basis test sets a very low bar, and Congress has exceptionally broad power in determining which classes of aliens may remain in the country.  The statute at issue here, 8 U.S.C. § 1101(f)(1), should easily clear that bar.  The majority holds that it does not by subverting the standards of

rational basis review to substitute its policy preference for that of Congress.

Properly applied, rational basis review "is a paradigm of judicial restraint." *Beach Communications*, 508 U.S. at 313. Regrettably, the majority opinion is not. It is an unwarranted intrusion on separation of powers, and it demands correction.

I respectfully dissent.